CORNELIA D. ENGLISH, complainant,

*v.*

JOHN T. ENGLISH, defendant.

[Decided February 13th, 1934.]

*Messrs. Kraemer, Siegler & Siegler,* for the complainant.

*Messrs. Child & Shipman,* for the defendant.

BACKES, V. C.

Immediately after the complainant's former suit for maintenance was decided against her, in January, 1932, in which she alleged cruelty, and at the hearing charged adultery, she sought a reconciliation. Rejection of her advances, regarded as not in good faith, is the basis of this second suit, alleging abandonment and refusal to support. The defendant counterclaims, alleging extreme cruelty, praying a divorce. The testimony of adultery was repeated in this suit to neutralize the proof of extreme cruelty.

They were married in 1914. He was a physician; she, a trained nurse. He returned from overseas after the war and established himself well in his profession in Irvington. They lived together until April 25th, 1931, when she drove him from the house, after assaulting him with an ice pick. There was some trouble in 1926. At a week-end party, over the Labor Day holiday, at their summer bungalow, one of their female guests, an intimate friend of both, is supposed to have told another female guest, upon their first meeting, that she and the doctor had been criminally intimate for the then past four years. She is also supposed to have later repeated the same story to the complainant on a visit to the chic sales

at midnight. The complainant says she forgave her hubsand after he had admitted one act of adultery, and then it passed out of their lives until revived in the divorce court. That the female guest flaunted her shame is highly improbable; the underlying facts are denied. The defendant says that after he had gone to sleep on the porch, the female guest, in frolic, pulled his toe to get him up to join the rest, and that the complainant accused him of an impropriety, which led to unhappiness and considerable irritation. The rift that gradually expanded and led to the final separation began February 15th, 1930, when, upon coming home late at night, she accused him of being out with a nurse, and, told by him the next morning where he had been, accused him of committing adultery with the woman upon whom he had called, claiming that she had found him at her apartment, heard the clinking of glasses, and saw him leave by the back door about midnight. She then accused the woman to her husband and, aroused, he telephoned and then called upon the defendant. The complainant knew he was coming, and fearing bloodshed, had a police lieutenant present. The husband called a second time, after giving the defendant three days to get out of town, accompanied by the same police lieutenant. They talked over the situation, and to the satisfaction of the husband that it was mischief of the complainant. The husband and wife were friends of the complainant and defendant; the latter had been their physician for eleven years, brought their children into the world, and had performed an operation upon the wife at or about the time of the last child's birth. On the day of the call upon the woman, he was attending their infant son, who was suffering from an ear trouble, and returned at nine or ten o'clock in the evening to see him again. The call was purely professional. The woman has the appearances of respectability and of honor. She was genuinely candid on the stand, distressed as she was by the wicked implication of unchastity. The complainant's story, that she saw them together at midnight, was an invention, like others in her testimony, to molest the defendant.

Nightly thereafter, often far into the morning, she upbraided, taunted and tormented him with the accusation,

threatening to kill him if she again found him with the woman. Distracted and alarmed, he, from time to time, called in brother physicians to observe and to quiet her, and her apprehension that he intended to commit her to an asylum only added to her frenzy. Forty harrowing days and nights of this, and she suggested a vacation as a healing means. They returned after a two-weeks' trip, and there was some betterment. The sixth day at home, overhearing a telephone message from a patient in the apartment house where the woman lived, she accompanied the defendant on his sick calls, and as they approached the house she rushed out of the car into the woman's apartment, hurling the same accusations against her, and then, over the telephone, to her husband. She went a third time to the apartment, to the husband and wife, repeating the accusations, adding that the defendant was dragging the woman's name in the mud, broadcasting that she had had an infection, the result of a venereal disorder, when he operated upon her. She also carried this scandal to the woman's mother. She demanded the defendant's discharge as their family physician, and it was sent in letter form, to be rid of her. But there was no peace for the defendant. She kept on nagging and accusing, and, under the grind, he landed in a hospital in the latter part of May, suffering from ulcers of the stomach, due, it is said, to "nerves" brought on by worry. During his stay there for a month, she annoyed him and he was taken to a sanitarium where she couldn't get in. He continued sick at his home during the summer; she persisted and finally, in August, a separation agreement was made. They remained under the same roof, ate at the same table, but ignored each other for a while until there was an easing up; in the week of and before the episode next to be told, they visited friends at Eatontown, during the hunting season, and stayed overnight in the same room. There was no reunion, for both sides say the separation agreement was kept until the final break.

After the woman and her husband heard of the agreement, they re-engaged the defendant as their family physician, and this coming to the notice of the complainant, through a telephone call for his services, in the latter part of March, 1931,

she telephoned the husband that his wife and the defendant were approaching their former illicit relations. He told her he knew all about the call, that he did not care to hear any more from her, and that if she didn't stop molesting his wife he would take action. And then, after returning from a hurried visit to the defendant's brother, to whom she accused the defedant of resuming criminal intimacy with the woman, she renewed the accusations to the defendant, hurling magazines at him, witnessed by the maid, and when he took hold to stop her, she scratched and he quit, bleeding behind the ears. She blamed their airedale, but there is little doubt who did the scratching. There was much ill feeling and unrest until April 25th, when, with a concealed ice pick she chased him, ordering him from the house. Her tale is that after some sharp words, he made a dive at her, and, under his advance, she retreated to the kitchen where she grabbed the weapon, using it in self-defense. She hurried out when she thought he was dialing for the police, and when she returned, having been to the police herself, and, as she says, advised by them, ordered him from the house. He left. Belief in his version finds substantial support in her then arrogance and in her previous generally belligerent attitude. That she was constantly the aggressor is only too plain from her repeated disdainful references to his passiveness, "you can't fight with Dr. English." It probably enraged her to more.

This narrative does not picture the complainant in her tantrums, in her attacks upon the defendant and in her encounters with the woman and her husband. Her profanity and her revolting pet curses for the defendant, may be found in the record; they are not fit for print.

Wantonly charging a spouse with adultery, may in itself be extreme cruelty. The slander is more odious when leveled at a virtuous wife, and more poignant is the suffering, for, socially, in her the sin is mortal, and true to tradition, she becomes an outcast as of old, when the adulteress was stoned to death and philandering went unpunished. The gravamen, on this score, is not the accusations of adultery to the defendant, for, in all probability they would have been passed off as insults, but the constant attacks and their virulence and

the maligning and scandalizing publication as a weapon to inflict injury and to ruin, were intolerable. The physical assaults in March and April, 1931, were culminations of her viciousness.

And that which occurred after the separation is yet to be told. While the incidents are not pleaded causes of action, they manifest the deep-seated hatred animating those charged in the counter-claim. To the state agent of an insurance company, for which the defendant was an examiner, the complainant told that he was a heavy drinker, patronized speakeasies, &c., and wondered that he considered him a proper examiner for the company. He lost his position as physician to an industrial plant because of her derogatory statements to the superintendent, upon three or four visits, that he was crazy, had been gassed in the war, was unfit to practice, and that he disclosed to others the secret disorders of his patients; and she cursed him roundly. To another she said she would give $25 to have him beaten up. In a collision of their cars on Park avenue, where she had gone at night to spy on him, which she untruthfully denied, she let out her usual oaths. Later she accused him over the telephone. Within the month of the hearing of this cause, she went to a relative's home, where the defendant was being entertained, and made a scene; foully berating him. And at the present hearing she kept spewing her rancor, to defame the defendant and to destroy him professionally; and she did not stop at romancing. Adding infamy, she accused him of having a venereal disorder in 1921, and that he infected her, but had at that time satisfied her of his innocence, and she was content with the absurd explanation that he had contracted it in unclean surroundings at a convalescent home. She, a trained nurse? And she accused that he had the disorder again in 1927, and after suffering with it and treating himself for a long spell and thinking himself clean, communicated it to her with the result, as she claims, that she was subjected to an operation and the removal of the ovaries and fallopian tubes. The operation, it is proved, was for appendicitis; the organs were involved and were removed to avoid complications. The defendant was at the time daily in the operating room, where

cleanliness is the first law. His practice, before entering the operating room, was to strip completely, and thus, exposed to his associates, the condition could not have escaped them, and they, as one, say it did not exist. Reactions to tests of his blood and urine were negative. Another thing that stands in refutation. The complainant wanted to go to the City Hospital; the defendant insisted that she go to the hospital in which he operated and that his fellows operate upon her. If she were at that time acutely suffering from the disorder, as she says she was, he surely would not have laid himself open to the shame. She says the defendant told her his last infection was contracted from the woman while delivering her child—that he was careless. The complainant knew this to be untrue and she admits that eight months before she testified, she discovered that the woman's baby was delivered a year after the defendant's supposed infection, and yet, unabashed, she told the scandal. The thing that stamps it as invented since the hearing in the previous suit is that she did not tell it at that time. Her explanation that her lawyer wanted that case to be a clean one is attenuated, for she there left nothing untold that would serve her. Since then she cooly calculated the harm to the defendant from the notoriety of exposing his patients to a loathesome disease; to ruin him as she had threatened.

There was a half-hearted effort to account for the misconduct, to a mental upset resulting from menopause. Mental disturbance is not uncommon, but the complainant stopped functioning more than two years before misbehaving, and she showed no signs in the meantime. Physicians pronounced her responsible.

Divorce for extreme cruelty is seldom sought by husbands. Whether this may be accounted for by better manners of wives or greater fortitude of husbands will not be debated. Naturally their methods of cruelty differ. Just how cruel a husband or wife may be and still escape the consequences will always be a vexed question, but if she is as misbehaved as this one was, her conduct comes within the accepted definition of extreme cruelty.

The defendant is entitled to a decree.